

1   WILKES & McHUGH
2   CASEY A. HATTON, SBN 246081
    3780 Kilroy Airport Way, Suite 220
3   Long Beach, CA 90806
    Telephone: (562) 424-3003
4

5   *Counsel for Plaintiffs*
    *and Proposed Class Members*

E-filing

**FILED**

APR 21 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7          UNITED STATES DISTRICT COURT

         NORTHERN DISTRICT OF CALIFORNIA
8
  MARY JANE GARLAND, LAURA ALLEN,
9   V. CARLOS PALMERI, M.D., and THOMAS
    LEWIS, on behalf of themselves and others
10   similarly situated;

11         Plaintiffs,

12       vs.

13   SONY OPTIARC. INC.; SONY OPTIARC
    AMERICA INC.; SONY NEC OPTIARC
14   INC.; SONY CORP.; TOSHIBA SAMSUNG
    STORAGE TECHNOLOGY CORP.;
15   TOSHIBA CORP.; SAMSUNG
    ELECTRONICS CO.; HITACHI-LG DATA
16   STORAGE INC.; HITACHI LTD.; and LG
    ELECTRONICS INC.;
17
        Defendants.
18

CASE NO. 10 1703 EDL

**INDIRECT PURCHASER
PLAINTIFFS' CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

19       Plaintiffs, indirect purchasers of products containing optical disk drives as defined
20   below, on behalf of themselves and all other similarly situated indirect purchasers, for their
21   Complaint against all Defendants named herein, demand trial by jury of all claims properly
22   triable thereby, and complain and allege as follows:

23

24

25

26

27

28

                  CLASS ACTION COMPLAINT

I.   **INTRODUCTION**

1.     This case arises out of a long-running conspiracy extending from at least November 1, 2005, through the present (the "Class Period"), among Defendants and their co-conspirators, with the purpose and effect of fixing, raising, and maintaining prices for products containing optical disk drives ("ODDs") (referred to collectively as "ODD Products") sold indirectly to Plaintiffs and other indirect purchasers throughout the United States.

2.     Plaintiffs are informed and believe, and thereon allege, that Defendants and their co-conspirators formed an international cartel to illegally restrict competition in the ODD market, targeting and severely burdening indirect purchasers throughout the United States.  During the Class Period, the conspiracy affected billions of dollars of commerce throughout the United States.

3.     Plaintiffs are informed and believe, and thereon allege, that said conspiracy included communications and meetings in which Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize the price at which ODD Products were sold in the United States in order to maintain price stability and increase profitability in the ODD market.

4.     Plaintiffs are informed and believe, and thereon allege, that Defendants fraudulently concealed their anticompetitive conduct from Plaintiffs and the Class in furtherance of the conspiracy.

5.     As a result of Defendants' price fixing conspiracy, Plaintiffs have been injured in their businesses and property by paying more for ODD Products than they otherwise would have paid in the absence of said conspiracy.  Such prices exceeded the amount Plaintiffs would have paid if the price for ODD Products had been determined by a competitive market.

6.     Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15

2
CLASS ACTION COMPLAINT

1   U.S.C. § 1, and to recover damages under state antitrust, consumer protection, unfair

2   trade, and/or deceptive trade practices laws, common law principles of restitution,

3   disgorgement, unjust enrichment, as well as to recover the costs of suit, including

4   reasonable attorneys fees, for the injuries that Plaintiffs and all others similarly situated

5   sustained as a result of the Defendants' conspiracy to fix, raise, maintain and stabilize the

6   prices of ODD Products.

7          7.      ODDs that are the subject of this lawsuit include the following formats for

8   use in notebook and desktop computers: CD-ROMS ("CD"), CD-recordable/rewritable

9   ("CD-R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable (DVD±R/RW), Blu-

10  Ray ("BD"), Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and HD-DVD.  During

11  the Class Period, ODDs served as one of the primary means for recording and reading

12  music, movies, and other digital data. During this time, Defendants' sales of ODDs

13  generated billions of dollars in annual revenues and exponentially grew due to the

14  increased utilization of computers in households and businesses throughout the United

15  States.  Nearly every computer that is used or sold in the United States today is equipped

16  with an ODD.

17                    II.    JURISDICTION AND VENUE

18         8.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C.

19  26) to secure equitable relief against Defendants due to their violations of Section 1 of the

20  Sherman Antitrust Act (15 U.S.C. 1), as well as under the antitrust and other laws of the

21  State of California and other States listed herein to obtain restitution, recover damages,

22  and to secure other relief against Defendants for violation of those laws.

23         9.      This Court has subject matter jurisdiction of the federal antitrust claims

24  asserted in this action under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C.

25  15(a) and 26), Title 28 United States Code Sections 1331 (federal question) and 1337 (a)

26  (commerce and antitrust regulation), and Section 1 of the Sherman Act (15 U.S.C. 1).

27  This Court has subject matter jurisdiction of the state law claims asserted in this action

28  under Title 28, United States Code Sections 1332(d) and 1367, in that the matter in

1  controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and in which
2  some members of the indirect purchaser Class are citizens of states different from some
3  Defendants, and certain Defendants are citizens or subjects of foreign states.

4         10.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22,
5  and 28 U.S.C. § 1391(b) and (c), in that one or more of the Defendants reside, is licensed
6  to do business in, or is found to or does transact business in this District. Additionally, a
7  substantial part of the interstate trade and commerce involved and affected by the alleged
8  violations of the antitrust laws was and is carried on in part within this District.

9         11.    During the Class Period, each Defendant or one or more of its subsidiaries,
10 conducted business throughout the United States, including this jurisdiction, and they
11 have purposely availed themselves of the laws of the United States, including specifically
12 the laws of the State of California and the individual states listed herein. Defendants'
13 ODD Products are sold in a continuous and uninterrupted flow of interstate commerce
14 and foreign commerce, including through and into this District.

15        12.    Defendants' business activities had a direct, substantial and reasonably
16 foreseeable effect on trade and commerce in the United States and caused antitrust injury
17 in the United States.

18        13.    Defendants' conspiracy to fix the price of ODD Products substantially
19 affected commerce throughout the United States and in each of the states identified
20 herein because Defendants, directly or through their agents and/or co-conspirators,
21 engaged in activities affecting each such state. Defendants have purposely availed
22 themselves of the laws of each state identified herein in connection with their activities
23 relating to the production, marketing and sale of ODD Products. Defendants produced,
24 promoted, sold, marketed, and/or distributed ODD Products, thereby purposefully
25 profiting from access to indirect purchasers in each such state. Defendants also
26 contracted to supply or obtain goods or revenue related to the business for ODD
27 Products. As a result of the activities described herein, Defendants:

28        a.     Caused damage to the residents of the states identified herein;

4
CLASS ACTION COMPLAINT

1        b.    Caused damage in each of the states identified herein by acts or

2            omissions committed outside each such state by regularly doing or

3            soliciting business in each such state;

4        c.    Engaged in persistent courses of conduct within each such state and/or

5            derived substantial revenue from the marketing of ODD Products (and

6            services related to such marketing); and

7        d.    Committed acts or omissions that they knew or should have known

8            would cause damage (and did, in fact, cause such damage) in each

9            such state while regularly doing or soliciting business in each such

10           state, engaging in other persistent courses of conduct in each such

11           state, and/or deriving substantial revenue from the marketing of ODD

12           Products in each such state.

13      14.    The conspiracy described herein adversely affected every person

14 nationwide and in each of the states identified in this Complaint who indirectly bought

15 Defendants' ODD Products. Defendants' conspiracy has resulted in an adverse monetary

16 effect on indirect purchasers in each state identified.

17      15.    Prices of ODD Products in each state can be manipulated by conspirators

18 within that state, outside of it, or both. Without enforcing the antitrust and/or consumer

19 protection laws of each state identified herein, companies that break the law will go

20 unpunished. Defendants knew that commerce in each state identified herein would be

21 adversely affected by implementing their conspiracy.

22                       **III.  PARTIES**

23 A.   **Plaintiffs**

24      16.    Within the Class Period, the following Plaintiffs indirectly purchased ODD

25 Products from one or more of Defendants named herein in the state in which he or she

26 resides for his or her own use and not for resale, and suffered injury as a result of

27 Defendants' illegal conduct described in this Complaint.

28      17.    Plaintiff Mary Jane Garland ("Iowa Plaintiff"), a resident of Iowa,

1   indirectly purchased an ODD when she purchased a personal computer during the Class

2   Period, and was injured as a result of Defendants' illegal conduct.

3      18.   Plaintiff Laura Allen ("Kansas Plaintiff"), a resident of Kansas, indirectly

4   purchased an ODD when she purchased a personal computer during the Class Period, and

5   was injured as a result of Defendants' illegal conduct.

6      19.   Plaintiff V. Carlos Palmeri, M.D. ("Kansas Plaintiff"), a resident of Kansas,

7   indirectly purchased an ODD when he purchased a personal computer during the Class

8   Period, and was injured as a result of Defendants' illegal conduct.

9      20.   Plaintiff Thomas Lewis ("New York Plaintiff"), a resident of New York,

10  indirectly purchased an ODD when he purchased a personal computer and DVD player

11  during the Class Period, and was injured as a result of Defendants' illegal conduct.

12  **B.   Defendants**

13     21.   Defendant Sony Optiarc America, Inc. ("SOA") is a wholly owned

14  subsidiary of Defendant Sony Optiarc, Inc. Defendant SOA is a Delaware corporation

15  with its business headquarters located at 1730 N. 1st Street, San Jose, California 95112.

16  During the Class Period, SOA manufactured, sold, and distributed ODD Products

17  throughout the United States.

18     22.   Defendant Sony Optiarc, Inc. ("SOI") is a Japanese company with its

19  headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-002,1 Japan. Prior to

20  its formation in 2008, Defendant SOI was a joint venture between Defendants Sony Corp.

21  and NEC Corp. called Sony NEC Optiarc, Inc. On September 11, 2008, Sony Corp.

22  purchased NEC Corp.'s interest in Sony NEC Optiarc, Inc. The company was

23  subsequently renamed SOI. In 2008, SOI reported revenues of $1.52 billion. During the

24  Class Period, SOI manufactured, sold, and distributed ODD Products throughout the

25  United States.

26     23.   Defendant Sony NEC Optiarc, Inc. ("SNOI") was a Japanese company with

27  its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.

28  Defendant Sony NEC Optiarc, Inc. was created on April 3, 2006 as a joint venture

between Defendants Sony Corp. and NEC Corp. in which Sony Corp. had a 55% interest and NEC Corp. had a 45% interest. Sony Corp. purchased NEC Corp.'s interest in Sony NEC Optiarc, Inc. in 2008 and renamed it Sony Optiarc, Inc. During the Class Period, SNOI manufactured, sold, and distributed ODD Products throughout the United States. Sony Corp. and NEC Corp. exercised joint control over SNOI.

24.     Defendant Sony Corp. ("Sony") is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Oasaka 545-8522, Japan. During the Class Period, Sony manufactured, sold, and distributed ODD Products throughout the United States.

25.     Defendant Toshiba Samsung Storage Technology Corp. ("TSST") is a joint venture of Defendants Toshiba Corp. and Samsung Electronics Co. that was established on April 1, 2004. Toshiba owns 51% of the stock in TSST, while Samsung owns the remaining 49%. TSST and Toshiba share corporate headquarters, which are located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, TSST manufactured, sold, and distributed ODD Products throughout the United States. Toshiba Corp. and Samsung Electronics Co. jointly control TSST. TSST forecasted revenue of Y250 billion in fiscal year 2004, when it was established.

26.     Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, Toshiba manufactured, sold, and distributed ODD Products throughout the United States.

27.     Defendant Samsung Electronics Co., Ltd. ("Samsung") is a Korean company with its principal place of business at Samsung Main Building, 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. During the Class Period, Samsung manufactured, sold, and distributed ODD Products throughout the United States.

28.     Defendant Hitachi-LG Data Storage ("HLDS") is a joint venture between Defendants Hitachi, Ltd. and LG Electronics, Inc., with its corporate headquarters located at 4F MSC Center Bldg., 22-23, Kaigan 3-chome, Minato-Ku, Tokyo 108-0022, Japan.

1   Hitachi, Ltd. owns 51% of the stock in HLDS, while LG Electronics, Inc. owns the
2   remaining 49%. Hitachi, Ltd. and LG Electronics, Inc. jointly control and direct the
3   operations of HLDS. HLDS was established in November of 2000 and started operation
4   in January of 2001. Between 2001 and 2005 HLDS sold over 170 million optical disk
5   drives, generating approximately $5.5 billion in total revenues. During the Class Period,
6   HLDS manufactured, sold, and distributed ODD Products throughout the United States.
7          29.    Defendant Hitachi, Ltd. ("Hitachi") is a Japanese company with its
8   principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280,
9   Japan. During the Class Period, Hitachi manufactured, sold, and distributed ODD
10  Products throughout the United States.
11         30.    Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity
12  headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South
13  Korea 150-721. During the Class Period, LG Electronics manufactured, sold, and
14  distributed ODD Products throughout the United States.
15  C.   Agents and Co-Conspirators
16         31.    Various other persons, firms and corporations, not currently named herein
17  as Defendants have participated as co-conspirators with the Defendants in the violations
18  alleged herein, and have performed acts and made statements in furtherance thereof.
19  Some of these firms are currently unidentified. Plaintiffs seek leave to amend this
20  Complaint to add co-conspirators as Defendants as they are conclusively identified.
21         32.    The acts alleged against Defendants in this Complaint were authorized,
22  ordered, or done by Defendants' officers, agents, employees, or representatives, while
23  actively engaged in the management and operation of each Defendant's business or
24  affairs.
25         33.    Each Defendant acted as the principal, agent, or joint venturer of, or for,
26  other Defendants with respect to the acts, violations, and common course of conduct
27  alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United
28  States agent for the ODDs and ODD Products made by its parent company.

8
CLASS ACTION COMPLAINT

34.     Whenever this Complaint refers to an act, deed or transaction of a corporation or entity, the Complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## V.     NATURE OF TRADE AND COMMERCE

### A.     Optical Disk Drive Technology

35.     Optical disks contain microscopic pits where data is stored. These pits are made from a crystalline metal alloy and are usually pressed into the disk in a spiral arrangement, starting at the center of the disk.   The pits are approximately 0.8 micrometers on CDs, 0.4 micrometers on DVDs, and 0.15 micrometers on BDs.  Once a disk containing data is inserted into an ODD, the disk spins while a lens inside the device guides a semiconductor laser beam over the disk and a photodiode detects the light reflected from the disk's bumps and pits. The laser moves outward from the center of the disk, scanning over the disk's surface. Then the photodiode reads the light's reflection as a binary code, a series of ones and zeros, that the computer translates into usable data. As the lasers hit the pits on a disk, changes in the intensity of the beams are detected and translated into electrical signals. The more pits that can be packed onto a disk, the more data that disk can store.  Reading the different disk formats requires an ODD to have lasers of different wavelengths.  Blu-ray disk players use a shorter wavelength laser to read disks, which is blue-violet.  Additional layers may also be added to the disk, allowing increased storage capacity.

36.     In addition to reading disks, ODDs can write and rewrite on the disk, depending on the technology of the drive and accompanying disk. Disks that have this capability are generally referred to as a recordable disk (*e.g.*, CD-R, DVD-R or BD-R). When a recordable disk is inserted into an ODD that has the ability to record data, the ODD's laser is used to selectively heat parts of the organic photosensitive dye layer. By exposing the disk to light with the laser, the reflective properties of the disk's surface

1  change, which causes the photodiode to recognize these changes as bumps and pits and
2  read the new information on the disk.

3     37.   An optical drive is about the size of a thick soft-cover book. The front of
4  the drive has a small Open/Close button that ejects and retracts the drive bay door. This is
5  how media like CDs, DVDs, and BDs are inserted into and removed from the drive.
6  Where the disk drive is intended for internal use in a computer, the sides of the drive
7  have pre-drilled, threaded holes for easy mounting in the drive bay in the computer case.
8  In that case, the optical drive is mounted so the end with the connections faces inside the
9  computer and the end with the drive bay faces outside. The back end of the optical drive
10  generally contains a port for a cable that connects to the motherboard. Also here is a
11  connection for power from the power supply. Most optical drives also have jumper
12  settings on the back end that define how the motherboard is to recognize the drive when
13  more than one is present. These settings vary from drive to drive.

14     38.   ODDs include half-height and slimline models. Half-height ODDs are
15  thicker and generally incorporated into desktop computer towers. Slimline ODDs are
16  thinner and generally incorporated into laptop computers. As laptop computers have
17  become more popular with consumers, demand for slimline optical disk drives has
18  increased and is expected to overtake half-height demand over the next five years.

19     39.   Table 1 provides an overview of the names, sizes and capabilities of the
20  main, available ODD standards. There are also differences in ODDs with regard to data
21  access speeds and writing speeds. ODDs built more recently are "backwards compatible"
22  such that ODDs with the latest technology can still read first generation CD-ROMs. DVD
23  rewriteable drives have been the mainstream ODD used in computers since 2006.

| Table 1: Overview of Optical Disk Drive Standards | | |
|---|---|---|
| | | |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |

CLASS ACTION COMPLAINT

| CD-RW | 700 MB | Read, Write, Rewritable |
|---|---|---|
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R [b] | 4.7 GB | Read, Write |
| DVD-RW [b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RE | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |

[a] These are standard capacities. Depending on the number of layers, or if the disk can be read double-sided, the capacity will be larger.

[b] There are other DVD standards such as DVD+R/RW, which include other features or improvements- see http://www.videohelp.com/dvd.

Source: See http://www.videohelp.com/dvd and http://www.tech-faq.com/blu-ray.shtml.

**B.  Optical Disk Drive Industry Background**

40.   The first ODD was invented with the creation of the audio compact disk (audio "CD"), which was jointly invented by Sony and Philips Electronics ("Philips"). In 1972, Philips announced a technique for storing audio recordings on an optical disk with a small diameter.  At the same time, Sony was exploring optically recording audio on a larger disk but was focusing on developing an error correction technique.  In 1978, Sony and Philips agreed on a single format for the disk and the error correction method that would be used.  The compact disk system was introduced to the public in Japan and Europe in 1982.  Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards set by Sony and Philips.

41.   Once a standard for creating a CD was established and an optical device that could read data from said disk was developed, CD-ROM drives began to penetrate the computer market.  ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer.  Thereafter,

11

1   manufacturers developed ODDs for computers that could read and write DVDs and Blu-
2   Ray disks, which can hold more data than an older CD-ROM.
3       42.   Today, ODDs are a standard component on almost every computer used in
4   the United States.  Due to the increasing popularity of personal computers, hundreds of
5   millions of ODD Products are shipped by Defendants each year, generating billions of
6   dollars in annual revenues.   As seen in Figures 1 and 2 below, worldwide ODD
7   shipments increased to over 300 million in 2007 and generated over $45 billion in
8   revenues between 2004 and 2008.



12



43.   In 2008, Samsung estimated that the ODD market for personal computers is 313 million units per year and the ODD market for all other applications (*e.g.*, automotive audio and video, personal video recorders, set top boxes, CD/ DVD players and recorders, camcorders, and game consoles) is 200 million units per year.

## VI.   CLASS ACTION ALLEGATIONS

44.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following Class (the "Nationwide Class" or "Class"):

> All persons and entities residing in the United States that, from at least
> November 1, 2005, through the present that indirectly purchased ODD
> Products in the United States from one or more Defendants for their own
> use and not for resale.   Specifically excluded from this Class are
> Defendants; the officers, directors or employees of any Defendant; any
> entity in which any Defendant has a controlling interest; and any affiliate,
> legal representative, heir or assign of any Defendant.   Also excluded are
> any federal, state, or local governmental entities, any judicial officer

13

1    presiding over this action and the members of his/her immediate family and

2    judicial staff, and any juror assigned to this action.

3

4          45.    Plaintiffs also bring this action on their own behalf and as a class action

5    pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or

6    respective state statute(s), on behalf of all members of the following state Classes

7    (collectively, the "Indirect Purchaser State Classes" or "State Classes" or "Classes"):

8          a.    **IOWA:**    All persons and entities in Iowa who indirectly

9          purchased an ODD manufactured and/or sold by one or more of the

10          Defendants during the Class Period, and did so for their own use and

11          not for resale.  Specifically excluded from this Class are Defendants;

12          the officers, directors or employees of any Defendant; any entity in

13          which any Defendant has a controlling interest; and any affiliate, legal

14          representative, heir or assign of any Defendant.  Also excluded are

15          any federal, state or local governmental entities, any judicial officer

16          presiding over this action and the members of his/her immediate

17          family and judicial staff, and any juror assigned to this action (the

18          "Iowa Indirect Purchaser Class").

19          e.    **KANSAS:**    All persons and entities in Kansas who indirectly

20          purchased an ODD manufactured and/or sold by one or more of the

21          Defendants during the Class Period, and did so for their own use and

22          not for resale.  Specifically excluded from this Class are Defendants;

23          the officers, directors or employees of any Defendant; any entity in

24          which any Defendant has a controlling interest; and any affiliate, legal

25          representative, heir or assign of any Defendant.  Also excluded are

26          any federal, state or local governmental entities, any judicial officer

27          presiding over this action and the members of his/her immediate

28          family and judicial staff, and any juror assigned to this action (the

1    "Kansas Indirect Purchaser Class").

2        f.    **NEW YORK:**    All persons and entities in New York who

3    indirectly purchased an ODD manufactured and/or sold by one or

4    more of the Defendants during the Class Period, and did so for their

5    own use and not for resale. Specifically excluded from this Class are

6    Defendants; the officers, directors or employees of any Defendant;

7    any entity in which any Defendant has a controlling interest; and any

8    affiliate, legal representative, heir or assign of any Defendant. Also

9    excluded are any federal, state or local governmental entities, any

10    judicial officer presiding over this action and the members of his/her

11    immediate family and judicial staff, and any juror assigned to this

12    action (the "New York Indirect Purchaser Class").

13        46.    The precise number of Class members is unknown to Plaintiffs because

14 such information is in the exclusive control of Defendants. However, due to the nature of

15 the trade and commerce involved, Plaintiffs are informed and believe, and thereon allege,

16 that there are at least hundreds of thousands in each Indirect Purchaser State Class and

17 most likely tens of millions of Nationwide Class members geographically dispersed

18 throughout the United States, such that joinder of all Class members is impracticable.

19        47.    Plaintiffs reserve the right to expand, modify or alter any and all Class

20 definitions in response to information learned during discovery.

21        48.    Plaintiffs reserve the right to expand, modify or alter the Class Period

22 definition in response to information learned during discovery.

23        49.    Plaintiffs' claims are typical of the claims of the other members of the

24 Class. Plaintiffs and all members of the Class are similarly affected by Defendants'

25 wrongful conduct in violation of the antitrust laws in that they paid artificially inflated

26 prices for ODD Products purchased indirectly from Defendants. Therefore, Plaintiffs'

27 claims arise from the same common course of conduct giving rise to the claims of the

28 members of the Class and the relief sough is common to the Class.

50.     Numerous questions of law or fact arise from Defendants' anticompetitive conduct that is common to the Class, including but not limited to:

a.      Whether Defendants, their agents, or co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices or allocate the market for ODD Products sold in the United States;

b.      Whether Defendants, their agents, or co-conspirators engaged in a contract, combination, and/or conspiracy to restrict output of ODD Products sold in the United States;

c.      The duration and extent of any contract, combination and/or conspiracy;

d.      Whether Defendants, their agents and/or co-conspirators were participants in the contracts, combinations and/or conspiracies alleged herein;

e.      Whether Defendants, their agents and/or Co-Conspirators engaged in conduct that violated Section 1 of the Sherman Act;

f.      Whether Defendants, their agents and/or co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain or stabilize prices of ODDs sold in and/or distributed in the United States;

g.      Whether Defendants, their agents, or co-conspirators engaged in conduct in violation of the antitrust, consumer protection, unfair trade, and/or deceptive trade practices laws of the various Indirect Purchaser States as alleged below;

h.      Whether the anticompetitive conduct of the Defendants, their agents and/or co-conspirators caused prices of ODDs to be artificially inflated to noncompetitive levels;

16
CLASS ACTION COMPLAINT

i.   Whether Defendants, their agents, or co-conspirators were unjustly enriched as a result of their inequitable conduct at the expense of the members of the Indirect Purchaser Classes;

j.   Whether Defendants, their agents, or co-conspirators fraudulently concealed the existence of their unlawful conduct;

k.   Whether Plaintiffs and the Indirect Purchaser Classes are entitled to injunctive relief, and if so, the nature and extent of such injunctive relief; and

l.   Whether Plaintiffs and the other members of the Indirect Purchaser Classes were injured by Defendants' conduct, and, if so, the appropriate Class-wide measure of damages for Class members.

51.   These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class member, including legal and factual issues relating to liability, damages, and restitution.

52.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.   It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.   It would be virtually impossible for all members of the Classes to intervene as parties-plaintiff in this action;

c.   It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

e.   It is appropriate treatment on a fluid recovery basis, which obviate any manageability problems; and

17

CLASS ACTION COMPLAINT

1         f.      It will provide court oversight of the claims process, once Defendants'

2           liability is adjudicated.

3       ~~53.   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs~~

4  indirectly purchased ODD Products from one or more of the Defendants.

5       54.   Named Plaintiffs will fairly and adequately represent the interests of the

6  Class in that Plaintiffs are indirect purchasers of ODD Products and have no interests that

7  are antagonistic to other members of the Class.   Furthermore, Plaintiffs have retained

8  competent counsel experienced in antitrust, class action, and other complex litigation.

9       55.   This case is also appropriate for certification as a class action because the

10  Defendants have acted and refused to act on grounds generally applicable to the Class, so

11  that final injunctive relief will be appropriate with respect to the Class as a whole.

12       56.   The claims asserted herein are also appropriate for class certification under

13  the laws of the State of California and of each of the other states under which claims are

14  asserted.

15

16              **VII.  FACTUAL ALLEGATIONS**

17       57.   Plaintiffs are informed and believe, and thereon allege, that faced with

18  shrinking profits from ODD Products, Defendants conspired to fix, raise, maintain, and

19  stabilize the price of ODDs in the United States at artificially inflated and anticompetitive

20  levels in order to preserve and increase their revenues.   This artificial price increase was

21  passed on from direct purchasers to indirect purchasers in the ODD Product market.

22  **A.   Characteristics of the ODD Products Industry Made it Ripe for Collusion**

23       58.   The ODD Products industry has several characteristics that facilitate a

24  conspiracy, including market concentration, ease of information sharing, multiple

25  interrelated business relationships, significant barriers to entry, and homogeneity of

26  products.

27  **Market Concentration**

28       59.   During the Class Period, the ODD industry has been dominated by

CLASS ACTION COMPLAINT

relatively few companies, including Defendants.  During the Class Period, Defendant HLDS, which is a joint venture between Defendants Hitachi and LG Electronics, ~~established itself as the industry's top manufacturer with overall annual market share of~~ between 25% and 30% of shipments.  TSST, a joint venture formed in 2004 by Defendants Toshiba and Samsung, holds an annual market share in excess of 20%, making it the second largest ODD manufacturer in the world.  SOI, originally the SNOI joint venture by Defendants Sony Corp. and NEC Corp., holds approximately 16% of the ODD market.  In 2008, SOI held approximately 42% of the Blu-Ray installed base share, which is significant because the BD is the de-facto next-generation DVD technology and allows ODD manufacturers to stand out in an industry that has been largely commoditized.  Sony's increased BD production was integral to their overall market share, increasing their overall shipments by approximately 6% that year.  In 2008, Defendants HLDS, TSST, and SOI were among the largest producers of ODDs in the world, with a combined market share of approximately 65%.  Defendants' dominance and control over the ODD market facilitated their ability to implement their conspiracy to fix the price of ODD Products.

**Joint Ventures and Coordinated Business Activities**

60.   Defendants were also involved and relied upon joint ventures and long standing business relationships in the ODD market that gave them continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.  As noted above, the first of these joint ventures was HLDS, which was established as a joint venture between Defendants Hitachi and LG Electronics in November, 2000 and started operation in January, 2001.  In April, 2004, Defendants Toshiba and Samsung consolidated their optical disk drive divisions to form TSST.  Approximately two years later, Sony and NEC Corporation entered into an optical disk drive joint venture to form SNOI.

61.   The formation of these joint ventures evidences the exchange of information between Defendants, which provided the opportunity to conspire, and

19

1   supported an ongoing antitrust conspiracy between them. Furthermore, the mutually

2   beneficial nature of the business relations between certain Defendants created a financial

3   incentive to do so. As one Sony spokesman explained when announcing the formation of

4   SNOI, the joint venture came into existence because: *"There was a feeling that those

5   two complementary strengths [Sony and NEC] would make more sense in a joint

6   venture than competing against each other."*

7        **Barriers to Entry in the ODD Industry**

8        62.    There are significant manufacturing and technological barriers to entry into

9   the ODD industry. In order to compete in the ODD industry, companies have to spend

10  hundreds of millions of dollars in research and development, licensing, manufacturing,

11  and marketing of products. Moreover, the ownership and control exerted by Defendants

12  over ODD Product technology and market share through their joint ventures has allowed

13  Defendants to dictate who enters the market and at what cost. These barriers to entry

14  have made it extremely difficult for smaller manufacturers of ODD Products to compete

15  with Defendants and overcome the effects of economies of scale. Accordingly, the

16  financial structure of the ODD industry allowed Defendants to implement their antitrust

17  conspiracy by eliminating competition and artificially stabilizing the prices of ODD

18  Products without losing market share.

19       **Trade and Business Organizations**

20       63.    During the Class Period, Defendants were members of trade and business

21  organizations that focused on ODD Products and related industries, such as the DVD

22  Forum, the Optical Storage Technology Association ("OSTA"), and the International

23  Symposium of Optical Memory ("ISOM"). The DVD Forum, which includes Defendants

24  Hitachi, LG Electronics, Samsung, Sony, and Toshiba as members of its steering

25  committee, is an organization responsible for the licensing and distribution of DVD

26  products whose "purpose is to exchange and disseminate ideas and information about the

27  DVD Format and its technical capabilities, improvements and innovations." OSTA's

28  members include LG Electronics and Sony. As explained on its website, OSTA was:

CLASS ACTION COMPLAINT

incorporated as an international trade association in 1992 to promote the use of writable optical technologies and products for storage of computer data.    The organization's membership includes optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments.   They work to shape the future of the industry through regular meetings of CD/DVD, file interchange, market   development,   magneto-optical   and   planning committees.

64.   During the Class Period, these organizations held multiple meetings and conferences attended by Defendants and their employees, which provided Defendants with the opportunity to meet, discuss, and agree upon their pricing of ODD Products.

**Standardization of ODD Products**

65.   Since its inception in the 1970s, the ODD industry has been typified by standardization of disks (*e.g.*, CD-ROMs, DVD-ROMs) and related ODD Products driven by industry participants and a variety of industry-related organizations such as ECMA International, the International Standardization Organization ("ISO"), and International Electrotechnical Commission ("IEC").   These organizations and their members are dedicated to "standardizing the use of information communication technology and consumer electronics."

66.   The ODD industry is also subject to patents and intellectual property rights which require adoption of standardized product specifications.   As stated by Philips Consumer Electronics B.V., which is responsible for the development of CD technology and continues to hold patents and licensing rights arising therefrom:

> Standardization offers many other advantages to industry as a whole. For example: [1] Improvements to performance, compatibility, reliability, safety and interoperability; [2] Economies of scale and lower costs – for example, by allowing manufacturers to address multiple regions with a single product or manufacturing line; and [3] *Cooperation between industry leaders, reducing the risk for 'first-mover' companies which pioneer new products or technologies*.(Emphases added)

67.   The standardization of the ODD Products industry provided Defendants with the mechanism to implement, enforce, and oversee their anticompetitive conspiracy to fix the price of ODD Products.  Furthermore, as a result of this standardization, ODD

21
CLASS ACTION COMPLAINT

1   Products are commodity products, and buyers make decisions to purchase such products

2   based largely, if not exclusively, on price.

3   B.   ~~Government Investigations of Price-Fixing in the ODD Market~~

4          68.    Defendants have been the subject of government investigations for their

5   cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300

6   million fine following an investigation by the United States Department of Justice

7   ("DOJ") into price-fixing of dynamic random access memory ("DRAM") computer chips.

8   The DOJ is currently investigating Samsung, LG Electronics, Toshiba, and Hitachi,

9   among others, concerning collusion among manufacturers of thin film transistor liquid

10  crystal display ("TFT-LCDs").   The ongoing TFT-LCD criminal investigation has

11  resulted in hundreds of millions of dollars in criminal penalties and admissions of guilt

12  by LG Electronics ($400 million) and Hitachi ($31 million).

13         69.    These same companies have been under investigation in the European

14  Union ("EU").   The entities mentioned in the preceding paragraph are all under

15  investigation for colluding to fix prices on TFT-LCDs sold in Europe.  In November,

16  2007, the EU fined, *inter alia*, Sony and various related entities and the Hitachi Maxell

17  Limited joint venture $110 million for fixing the prices of professional videotapes sold in

18  Europe between 1999 and 2002. Similarly, Hitachi and Toshiba were fined by the

19  European Commission for their roles in a conspiracy to control prices and allocate market

20  shares in the market for gas-insulated switchgear between 1988 and 2004.

21         70.    Plaintiffs are informed and believe, and thereon allege, that Defendants are

22  currently under investigation by the DOJ for anticompetitive conduct in connection with

23  the ODD industry.  Plaintiffs are further informed and believe, and thereon allege, that

24  the United States' criminal investigation of the ODD conspiracy is being conducted by

25  the DOJ's Antitrust Division in the Northern District of California.

26         71.    On Monday, October 26, 2009, Defendants SOA, TSST and HLDS

27  confirmed that they received subpoenas from the DOJ in connection with a criminal

28  antitrust investigation into possible price-fixing, bid-rigging, and allocation of markets

CLASS ACTION COMPLAINT

1  regarding ODDs.  News reports indicated that EU and Singaporean antitrust authorities

2  were conducting similar investigations.

3  ~~72.    It is significant that Defendants' anticompetitive behavior has been the~~

4  subject of a criminal grand jury investigation by the DOJ.  In order for the DOJ to

5  institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a

6  crime has been committed and prepare a detailed memorandum to that effect.  *See*

7  Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes

8  that a criminal violation of the antitrust laws has occurred, he should prepare a

9  memorandum requesting authority to conduct a grand jury investigation.")  Furthermore,

10  following a review of the memorandum, the request for a grand jury must be approved by

11  the Assistant Attorney General for the Antitrust Division, based on the standard that a

12  criminal violation may have occurred.  *See id.*  In addition, the fact that the DOJ Antitrust

13  Division investigation is criminal, as opposed to civil, is significant as well.  The

14  Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

15  Investigation" state: "[i]n general, current Division policy is to proceed by criminal

16  investigation and prosecution in cases involving horizontal, *per se* unlawful agreements

17  such as price fixing, bid rigging and horizontal customer and territorial allocations."  *See*

18  Antitrust Division Manual, Chapter III.C.5.  Accordingly, the existence of a criminal

19  investigation into the ODD industry supports the existence of the conspiracy alleged

20  herein.

21  C.    **Effects of Defendants' Antitrust Violations**

22  73.    The above combination and conspiracy has had the following effects,

23  among others:

24  a.    Price competition in the sale of ODD Products by Defendants and their

25  co-conspirators has been restrained, suppressed, and eliminated

26  throughout the United States;

27  b.    Prices for ODD Products sold by Defendants have been raised, fixed,

28  maintained, and stabilized at artificially high and noncompetitive

23

CLASS ACTION COMPLAINT

levels throughout the United States;

    c.    Inflated prices have been passed on from direct purchasers to indirect purchasers; and

    d.    Indirect purchasers of ODD Products have been deprived of the benefit of free and open competition in the purchase of ODD Products.

74.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and other members of the Nationwide Class have been injured in their businesses and property in that they paid more for ODD Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**D.    Fraudulent Concealment**

75.    Plaintiffs and members of the Classes alleged herein had neither actual nor constructive knowledge of the facts constituting its claim for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and members of said Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until October, 2009 when the antitrust investigation by the DOJ became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs or members of said Classes alleged herein on inquiry notice that there was a conspiracy to fix prices for ODDs or that they were paying artificially high prices for ODD Products.

76.    Plaintiffs are informed and believe, and thereon allege, that the affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

77.    Plaintiffs are informed and believe, and thereon allege, that by its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. As alleged above, Defendants had secret discussions about price and output through joint ventures, direct contact, and through trade and business organizations. Defendants agreed not to publicly discuss the existence or the nature of their agreements.

78.    Plaintiffs are informed and believe, and thereon allege, that Defendants

1    repeatedly gave pre-textual justifications for the inflated prices of ODDs and ODD

2    Products in furtherance of the conspiracy.

3        79.    Plaintiffs are informed and believe, and thereon allege, that Defendants'

4    purported reasons for the pricing of ODDs and ODD Products were materially false and

5    misleading and made for the purpose of concealing Defendants' anti-competitive scheme

6    as alleged herein. As a result of Defendants' fraudulent concealment of their conspiracy,

7    the running of any statue of limitations has been tolled with respect to any claims that

8    Plaintiffs or any proposed Class members have alleged in this Complaint as a result of the

9    anticompetitive conduct.

10

11                        VIII.  VIOLATIONS ALLEGED

12        A.    First Claim for Relief: Violation of Section 1 of Sherman Act

13        80.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each

14    and every allegation set forth in the preceding paragraphs of this Complaint.

15        81.    Beginning at least as early as November 1, 2005, the exact date being

16    unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants,

17    their agents and co-conspirators engaged in a continuing contract, combination or

18    conspiracy to suppress and eliminate competition by fixing the prices of ODDs. The

19    contract, combination or conspiracy engaged in by Defendants and their co-conspirators

20    was an unreasonable restraint of interstate and foreign trade and commerce in violation of

21    Section 1 of the Sherman Act (15 U.S.C. § 1).

22        82.    In particular, Defendants have combined and conspired to raise, fix,

23    maintain or stabilize the prices of ODD Products sold in the United States.

24        83.    The contract, combination or conspiracy among Defendants consisted of a

25    continuing agreement, understanding, and concert of action among Defendants, their

26    agents and/or their co-conspirators, the substantial terms of which were to agree to fix the

27    prices of ODDs.

28        84.    As a result of Defendants' unlawful conduct, prices for ODD Products were

                                            25

1   raised, fixed, maintained, and stabilized in the United States.

2       85.    For purposes of formulating and effectuating the charged contract,

3   combination, or conspiracy, Defendants, their agents and co-conspirators did those things

4   they contracted, combined, or conspired to do, including, among other things:

5           a.    participating in meetings, conversations and communications to

6                 discuss the prices and supply of ODD Products;

7           b.    communicating in writing and orally to fix prices of ODD Products;

8           c.    agreeing, during those meetings, conversations and communications,

9                 to manipulate and set pre-determined prices and supply of ODD

10                Products sold in the United States in a manner that deprived indirect

11                purchasers of free and open competition in the market;

12          d.    Issuing price announcements and price quotations in accordance with

13                the agreements reached;

14          e.    selling ODD Products to direct purchasers in the United States at non-

15                competitive prices, which were then passed on to indirect purchasers;

16          f.    providing false statements to the public to explain increased prices for

17                ODD Products; and

18          g.    exchanging information on sales of ODD Products, for purpose of

19                monitoring and enforcing adherence to the agreed-upon price.

20      86.    As a result of Defendants' unlawful conduct, Plaintiffs and the other

21  members of the Nationwide Class have been injured in their businesses and property in

22  that they have paid more for ODD Products than they otherwise would have paid in the

23  absence of Defendants' unlawful conduct.

24      87.    Plaintiffs and the Nationwide Class are entitled to an injunction against

25  Defendants, preventing and restraining the violations alleged herein.

26

27  B.    **Second Claim for Relief:   Unjust Enrichment and Disgorgement of**

28        **Profits**

88.   Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

89.   Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the profits that resulted from those transactions throughout the United States.

90.   Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

91.   Plaintiffs and all members of the Class seek disgorgement of all profits resulting from said overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**C.   Third Claim for Relief:   Violation of State Antitrust and Unfair Competition Laws**

92.   Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

93.   Plaintiff Mary Jane Garland ("Iowa Plaintiff") incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.   Defendants' combinations or conspiracies had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout Iowa; (2) ODD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Iowa Plaintiff and members of the Iowa Indirect Purchaser Class were deprived of free and open competition; and (4) Iowa Plaintiff and members of the Iowa Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODDs and ODD Products.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct,

Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

94.   Plaintiffs Laura Allen and V. Carlos Palmeri, M.D. ("Kansas Plaintiffs") incorporate and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.   Defendants' combinations or conspiracies had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout Kansas; (2) ODD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Kansas Plaintiffs and members of the Kansas Indirect Purchaser Class were deprived of free and open competition; and (4) Kansas Plaintiffs and members of the Kansas Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODDs and ODD Products.

b.   During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Kansas Plaintiffs and members of the Kansas Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Kansas Plaintiffs and the members of the Kansas

1      Indirect Purchaser Class seek all forms of relief available under

2      Kansas Stat. Ann. §§ 50-101, *et seq.*

3      95.    Plaintiff Thomas Lewis ("New York Plaintiff") incorporates and re-alleges

4 each and every allegation set forth in the preceding paragraphs of this Complaint.

5             a.     Defendants' combinations or conspiracies had the following effects:

6                 (1) ODD price competition was restrained, suppressed, and eliminated

7                 throughout New York; (2) ODD prices were raised, fixed, maintained

8                 and stabilized at artificially high levels throughout New York; (3)

9                 New York Plaintiff and members of the New York Indirect Purchaser

10                 Class were deprived of free and open competition; and (4) New York

11                 Plaintiff and members of the New York Indirect Purchaser Class paid

12                 supra-competitive, artificially inflated prices for ODDs and ODD

13                 Products.

14             b.     During the Class Period, Defendants' illegal conduct substantially

15                 affected New York commerce.

16             c.     As a direct and proximate result of Defendants' unlawful conduct,

17                 New York Plaintiff and members of the New York Indirect Purchaser

18                 Class have been injured in their business and property and are

19                 threatened with further injury.

20             d.     By reason of the foregoing, Defendants entered into agreements in

21                 restraint of trade in violation of New York Gen. Bus. §§ 340, *et seq.*

22                 Accordingly, New York Plaintiff and the members of the New York

23                 Indirect Purchaser Class seek all forms of relief available under New

24                 York Gen. Bus. §§ 340, *et seq.*

25

26 **D.**     **Fourth Claim for Relief: Violation of State Consumer Protection and**

27 **Unfair Competition Laws**

28     96.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each

CLASS ACTION COMPLAINT

1  and every allegation set forth in the preceding paragraphs of this Complaint.

2      97.    Plaintiffs Laura Allen and V. Carlos Palmeri, M.D. ("Kansas Plaintiffs")

3  incorporates and re-alleges each and every allegation set forth in the preceding

4  paragraphs of this Complaint.

5          a.    The conduct of Defendants described herein constitutes consumer

6              oriented deceptive acts or practices within the meaning of Kansas law,

7              which resulted in consumer injury and broad adverse impact on the

8              public at large, and harmed the public interest of Kansas in an honest

9              marketplace in which economic activity is conducted in a competitive

10             manner.

11         b.    Defendants' unlawful conduct had the following effects: (1) ODD

12             price competition was restrained, suppressed and eliminated

13             throughout Kansas; (2) ODD prices were raised, fixed, maintained,

14             and stabilized at artificially high levels throughout Kansas; (3) Kansas

15             Plaintiffs and members of the Kansas Indirect Purchaser Class were

16             deprived of free and open competition; and (4) Kansas Plaintiffs and

17             members of the Kansas Indirect Purchaser Class paid supra-

18             competitive, artificially inflated prices for ODD Products.

19         c.    During the Class Period, Defendants' illegal conduct substantially

20             affected Kansas commerce and consumers.

21         d.    As a direct and proximate result of Defendants' unlawful conduct,

22             Kansas Plaintiffs and members of the Kansas Indirect Purchaser Class

23             have been injured and are threatened with further injury.

24         e.    Kansas Plaintiffs and members of the Kansas Indirect Purchaser Class

25             seek actual damages for their injuries caused by these violations in an

26             amount to be determined at trial and are threatened with further

27             injury.  Defendants have engaged in unfair competition or unfair or

28             deceptive acts or practices in violation of Kansas Stat. § 50-623, et

30
CLASS ACTION COMPLAINT

*seq.*, and, accordingly, Kansas Plaintiffs and all members of the Kansas Indirect Purchaser Class seek all relief available under Kansas Stat. § 50-623, *et seq.*

98. Plaintiff Thomas Lewis ("New York Plaintiff") incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which ODDs were sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiffs and the New York Indirect Purchaser Class.

b. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law §§ 349, et seq., which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c. Defendants' unlawful conduct had the following effects: (1) ODD price competition was restrained, suppressed and eliminated throughout New York; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York Plaintiff and members of the New York Indirect Purchaser Class were deprived of free and open completion; and (4) New York Plaintiff and members of the New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

d. During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

e. As a direct and proximate result of Defendants' unlawful conduct,

31
CLASS ACTION COMPLAINT

New York Plaintiff and members of the New York Indirect Purchaser Class have been injured and are threatened with further injury.

f.   New York Plaintiff and members of the New York Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.   Without prejudice to their contention that Defendant's unlawful conduct was willing and knowing, New York Plaintiff and members of the New York Indirect Purchaser Class do not seek in this action to have treble damages in this action pursuant to N.Y. Gen. Bus. Law §349(h).

## IX.   DAMAGES

99.   During the Class Period, Plaintiffs and the other members of the Classes alleged herein purchased ODDs indirectly from Defendants, their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations.  As a result, Plaintiffs and the other Class members have sustained damages to their businesses and property in an amount to be determined at trial.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf and on behalf of the Nationwide Class members, adjudging and decreeing that:

A.   This Court determine that the Sherman Act, state antitrust law, and state consumer protection and unfair competition law claims alleged herein may be maintained as a class action suit under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws;

B.   This action may proceed as with named Plaintiffs as the designated Class Representatives and their counsel as Class Counsel;

C.   The unlawful conduct, contract, conspiracy and combination alleged herein

32

CLASS ACTION COMPLAINT

be adjudged and decreed to be:

1.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief herein, and that Plaintiffs and the Nationwide Class have been inured in their businesses and property as a result of Defendants' actions;

2.    Acts of unjust enrichment as set forth in the Second Claim for Relief herein;

3.    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust laws identified in the Third Claim for Relief herein; and

4.    Violations of the state consumer protection and unfair competition laws identified in the Fourth Claim for Relief herein;

D.    Plaintiffs and the members of the Classes alleged herein recover damages sustained by them, as provided by state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Classes alleged herein be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.    Plaintiffs and the State Classes alleged herein recover damages, to the maximum extent allowed by state consumer protection laws,

F.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

G.    The Court enter an order of divestiture requiring Defendants to rescind and/or dissolve the cooperation agreements, joint ventures and/or cross-license agreements alleged herein between and among them used to facilitate the conspiracy alleged herein;

H.    Plaintiffs and members of the Classes alleged herein be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

I.    Plaintiffs and the members of the Classes alleged herein be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiffs and the members of the Classes alleged herein recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiffs and the members of the Classes alleged herein receive such other or further relief that the Court deems to be just and proper under the circumstances.

## XI.    JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all of the triable claims asserted in this Complaint.

DATED: April 20, 2010                    By: _____

Casey A. Hatton (SBN 246081)
Wilkes & McHugh
3780 Kilroy Airport Way, Suite 220
Long Beach, CA 90806
Telephone: (562) 424-3003

*Counsel for Plaintiffs*
*and Proposed Class Members*